**Leon RICHARDSON, Appellant,**

v.

**UNITED STATES, Appellee.**

**No. 01–CF–11.**

District of Columbia Court of Appeals.

Argued Feb. 15, 2006.
Decided March 2, 2006.

---

Ferris R. Bond, Washington, DC, appointed by the court, for appellant.

Bernard J. Delia, Assistant United States Attorney, with whom Kenneth L. Wainstein, United States Attorney, and John R. Fisher, Assistant United States Attorney at the time the brief was filed, and David B. Goodhand, Anthony Asuncion, and Jeffrey Beatrice, Assistant United States Attorneys, were on the brief, for appellee.

Before WASHINGTON, Chief Judge, REID, Associate Judge, and KING, Senior Judge.

REID, Associate Judge:

During the course of trial, and after trial, appellant, Leon Richardson, moved for a mistrial and a new trial based upon an allegation of juror bias and taint due to eye contact between two jurors and two defense witnesses.[1] The trial court denied both motions. We conclude that the trial judge conducted a proper inquiry into the allegations of improper jury contact and did not abuse his discretion in denying both motions. Therefore, we affirm the judgment of the trial court.

## FACTUAL SUMMARY

Since the facts of the underlying crimes are irrelevant to our analysis, we focus only on the factual context of the improper juror contact argument that Mr. Richardson presents on appeal. The record shows that Mr. Richardson's trial began on July 11, 2000, and the case was submitted to the jury on July 20, 2000. On July 24, 2000, the trial judge held a conference with government and defense counsel during which he discussed with them the possibility of a pause in the jury's deliberations due to the death of a juror's relative. The judge also informed counsel that two other jurors had sent notes to the court. Juror number 6 wrote:

> This note[ ] is to advise you of the fact that there was a -- there was very uncomfortable eye contact between the accused, Mr. Leon Richardson's sister ... and I. Please be advised I do not feel threatened at this point. However, this is only to advise you of the incident.

The second note, sent by Juror number 4, read:

> Friday, [July] 21, 2000. As I returned from lunch, Mr. Pedrick Knight, Jr., was standing in close proximity to the entrance to the jury room entrance. He was standing alone. Mr. Knight deliberately made eye contact.

Defense counsel asked for an opportunity to discuss the notes with Mr. Richardson,[2] and the trial judge decided to bring the jurors in to let them know about the death of a juror's relative, and the court's plan to put off further jury deliberations until July 31, 2000, to permit the affected juror to attend the out-of-town funeral.

When the trial judge and the attorneys resumed their discussion of the notes from Jurors 4 and 6, defense counsel revealed his conviction that defense witness Knight was not in the court on the day Juror number 4 reportedly saw him. Defense counsel suggested that one possibility was that the juror was "deliberately trying to sabotage the deliberation process." At the suggestion of Mr. Richardson's counsel, the judge decided to question Jurors 4 and 6 about their notes, and to find out whether they discussed their notes with other jurors. Juror number 4 maintained that he had not discussed the note with any other juror, that he was "not intimidated" but was "just following the rules" to disclose any contact. In response to defense counsel's question whether the contact with Mr. Knight "might influence [the juror's] ability to be fair and impartial," Juror number 4 said: "Of course not. As I told you before, I'm simply following the

---

**1.** Mr. Richardson was convicted of assault with intent to kill while armed, in violation of D.C.Code §§ 22–501, –3202 (1996), recodified at 22–401, –4502 (2001); first-degree murder while armed (premeditated), in violation of §§ 22–2401, –3202, recodified at 22–2104, –4502; possession of a firearm during a crime

of violence, in violation of § 22–3204(b), recodified at 22–4504(b); and carrying a pistol without a license, in violation of § 22–3204(a), recodified at 22–4504(a).

**2.** Mr. Richardson informed counsel that he did not wish to proceed without twelve jurors.

rules that [were] stated. That's all. That's all I'm doing." After Juror number 4 left the courtroom, defense counsel requested "an opportunity to bring Mr. Knight down and put him under oath . . . ." The judge expressed reluctance to grant defense counsel's request because it might "call[ ] for [him] to make a credibility finding whether to believe the . . . juror versus the witness," and he was "not inclined to make that kind of a decision." Defense counsel suggested that if Mr. Knight was not present in court on the day Juror number 4 claimed to have seen him, that would "go[ ] to the [juror's] ability to be able to recall" and would indicate that the juror "is not competent" and "should not be on [the] jury." Furthermore, "[i]t is prejudicial to the defendant, if we have a juror in this case who is incompetent."

Government counsel asserted that Juror number 4 saw "someone he believed to be Mr. Knight[ ] and given that, . . . the only real issue is . . . how if any has that affected his ability to deliberate in a fair and just manner." After further discussion, the trial judge declared, in part: "The court will deny the defense motion to bring in the witness Pedrick Knight . . . . The key . . . is whether or not this incident, if it occurred, would affect his ability to continue as a juror. He's indicated it does not. And the court will stand as to that." At defense counsel's request, the trial court contemplated bringing each juror into the courtroom for questioning, but decided first to question Juror number 6.[3]

Juror number 6 explained that the contact with the defendant's relative was made outside the court building that morning as the juror approached the front door. The eye contact lasted "two seconds."

When asked to describe the eye contact, Juror number 6 said: "she just looked mean." The juror felt uncomfortable because of "the way she looked." The juror described a "stare" in an effort to communicate how the defendant's relative made the eye contact. Juror number 6 did not "feel threatened" due to the contact, did not believe that the relative "was trying to threaten [her,]" did not think the contact "would affect [her] ability to serve as a juror," and had "not discussed the contents of [her] note with any of the other jurors," although the other jurors knew that she had drafted a note to the court. As the questioning continued, Juror number 6 stated that "another juror . . . had an[ ] encounter" but that "[t]hey didn't tell us what it was about." That juror "mentioned a name but [the] foreman . . . stopped [that juror] and said we can't discuss it . . . ." Juror number 6 did not recall the name.

Following the questioning of Juror number 6, additional discussion with counsel, briefing of the jury about the delay, and a recess during which the trial judge examined applicable law, the judge decided to "voir dire the foreperson" of the jury, and then to consider whether the rest of the jurors should be questioned. In response to the trial judge's question as to whether Juror number 4 had discussed "something [that] had occurred with a witness in this case," the jury foreman said:

> He came in this morning and he said what was the name of the gentleman who testified for the defense, Patrick or something, and I said it was Pedrick. I sit next to him in the jury room. And all the jurors were assembled or -- yeah. And he said because -- he indicated that

---

3. Before Juror number 6 was brought in, the deputy clerk informed the court that when he went to get Juror number 4 from the jury room, another juror asked why he was going into the courtroom. Juror number 4 replied, "because of my note[, a]nd the jurors laughed."

he had had some contact with him. I said— I forget in which sequence of events this occurred, but I flipped through my notes and I said -- I referred to my notes and I said it was Pedrick O. Knight, Jr., was his name .... And he then indicated that he had had some contact with him. And then I said basically wait a minute; we're not supposed to hear that; you need to write your own note. And he said, well, it wasn't a verbal contact. And he wrote out a note. And at that point we gave it to you .... He said that he had had contact. He said it was not verbal. He said something that indicated it was non-verbal like a look.

I should tell you in the interest of complete disclosure, at that point the other juror member who had an issue said something to the effect I had an issue, too, or I had something happen, too.

And I said, wait a minute. You guys both need to put that in your own note, because I know the judge said if somebody contacts you don't mention it to the rest of us, just put it in a note.

After the exit of the jury foreperson, defense counsel renewed his motion for a mistrial, pointing to "discussion in the jury room concerning matters that have nothing to do with the evidence that has been introduced in this case." In addition, defense counsel asserted that, based on the foreperson's account, Juror number 6 "was not fully candid" when she was questioned. Defense counsel expressed concern about "having people deliberating in this case, one, who do not follow instructions of this court and two who are not being truthful." Government counsel disagreed, indicating that "if anything, the foreperson's recollection of events is consistent with the recollection of events of Juror number 6." The trial court then made a finding that no juror had been "untruthful," and that the burden was on the defense to establish untruthfulness of the jurors. Furthermore, based upon the court's discussions with Jurors number 4 and 6, and the foreperson, "the substance of what occurred" was not conveyed to the other jurors. The trial judge also declared, in part: "The court has voir dired three of the jurors and does not find that the jury has been tainted in any way, which would affect the jury verdict .... The court will admit that it's not perfect, however, it is more than fair." Defense counsel reiterated his request to bring in Mr. Knight for a voir dire, which the court denied. The trial judge explained his denial as follows:

It is not the court's function to determine whether or not this juror is lying based upon the evidence that's been presented, and therefore, it would be useless, since the court has not made a threshold finding that the juror is lying, to bring in a witness to testify regarding facts that go to that issue.

Whether or not that juror was here is irrelevant to my decision. This juror believes that this person was here. Whether or not he's here or not does not make him a liar.

He may have been mistaken, but that is different from being a liar. And so, therefore, the court believes that the same evidence that you wish to present on this issue can be presented post-trial by way of affidavit, if you cho[o]se to renew that issue.

But the court does not get into an issue of credibility between jurors and witnesses and so for that reason the court denied your request to be permitted to call [Mr. Knight].

Before recessing deliberations until July 31, 2000, the trial judge explained to the jury the reason for the delay, and com-

mended the jury for following his instructions. He also stated:

> The two notes that we had discussed from Jurors 4 and 6 have nothing to do with the evidence in this case. You are not to infer anything from those notes and you are not to consider them in your deliberations. So you should consider only what you have heard in the courtroom here; those exhibits which have been admitted into evidence; the testimony of those witnesses and the stipulations which counsel have agreed to.

When the deliberations resumed, the jury reached a verdict of guilty on all counts. Mr. Richardson filed a motion for a new trial. He maintained that Juror number 4 had been untruthful during his voir dire because, contrary to his statements to the trial court, he had in fact disclosed information about the contact to other jurors, and because he could not have had contact with Mr. Knight since Mr. Knight was at work, as evidenced by an affidavit from Mr. Knight and his work record for the day in question. He contended, in part, that Juror number 4 had "tainted the other jurors, defense witness Pedric[k] Knight's credibility, as well as the jury deliberation process." The trial court denied the motion based upon his ruling on July 24, 2000. The motion did not mention Juror number 6.

## ANALYSIS

■ Mr. Richardson claims, in essence, that the trial court erred by not granting his motion for a mistrial after Juror number 6 reported "very uncomfortable eye contact" with a relative of the defendant who was a defense witness, and Juror number 4 asserted that a defense witness "deliberately made eye contact" with him.

Mr. Richardson argues, in essence, that Jurors number 4 and 6 were not impartial following the contacts and should not have been allowed to continue participating in the jury deliberations, that they "tainted" other members of the jury, that the trial court's "limiting instruction was not sufficient to remove the taint," and that "the government did not and could not establish the contact was harmless to [Mr.] Richardson." He faults the trial court for failing to take testimony from Mr. Knight and, implicitly, for not conducting a *voir dire* of the other jurors to determine what Jurors number 4 and 6 communicated to them and how the communication impacted the jury deliberations. He also contends that the trial court erred by not granting his motion for a new trial based on the eye contacts with defense witnesses.[4] The government maintains that upon receiving the notes from both jurors, the trial court conducted a proper inquiry into the matter "which was sufficient to rebut the possibility of prejudice that gave rise to the need for an inquiry." The government also asserts that Mr. Richardson "suffered no prejudice and his motions for a mistrial and a new trial were both appropriately denied."

■ Our analysis is guided by the following legal principles. "The right to trial by [an] impartial jury is 'fundamental and deeply embedded in American jurisprudence.'" *West v. United States*, 866 A.2d 74, 82 (D.C.2005) (quoting *Hughes v. United States*, 689 A.2d 1206, 1207 (D.C. 1997)). "[A]lthough improper juror contact is presumptively harmful, a party claiming prejudice from such contact is not entitled to a mistrial without more." *Washington v. Washington Hosp. Ctr.*, 579 A.2d 177, 184–85 (D.C.1990) (citing *Rem-*

---

4. In his motion for a new trial, Mr. Richardson did not mention Juror number 6, and arguably has waived that claim.

*mer v. United States,* 347 U.S. 227, 229, 74 S.Ct. 450, 98 L.Ed. 654 (1954)). Thus, "[w]here . . . the impartiality of a juror has been plausibly called into question, it is the responsibility of the trial judge to hold a hearing to determine whether the allegation of bias has merit." *Al–Mahdi v. United States,* 867 A.2d 1011, 1018 (D.C. 2005) (quoting *Medrano–Quiroz v. United States,* 705 A.2d 642, 649 (D.C.1997)) (internal quotation marks omitted). "The judge must conduct 'a thorough inquiry . . . into whether the defendant suffered *actual* prejudice.'" *Id.* at 1018 (quoting *Hill v. United States,* 622 A.2d 680, 684 (D.C.1993)) (emphasis in original) (referencing *Smith v. Phillips,* 455 U.S. 209, 215, 102 S.Ct. 940, 71 L.Ed.2d 78 (1982)). "[U]pon a *prima facie* showing of juror bias or partiality, 'it is the government's burden to demonstrate that the juror's contact with extraneous information [or, as here, with a trial witness] was harmless or non-prejudicial.'" *Id.* At 1019 (quoting *Hill, supra,* 622 A.2d at 684). Furthermore, "'[t]he extent and type of the trial court's investigation into the improper contact are confided to the court's discretion and reviewable only for abuse.'" *Id.* at 1019 (quoting *Leeper v. United States,* 579 A.2d 695, 699 (D.C.1990) (footnote omitted)); *see also Bellamy v. United States,* 810 A.2d 401, 409–10 (D.C.2002). "'An assessment of juror bias [may] require [ ] consideration of a number of factors, including the nature of the communication, the length of the contact, the possibility of removing juror taint by a limiting instruction, and the impact of the communication on both the juror involved and the rest of the jury.'" 867 A.2d at 1019 (citations omitted). We review the denial of a motion for a new trial under an abuse of discretion standard. *See Derrington v. United States,* 488 A.2d 1314, 1339 (D.C. 1985), *cert. denied,* 486 U.S. 1009, 108 S.Ct. 1738, 100 L.Ed.2d 201 (1988).

Given the applicable legal principles, the question before us is whether the trial court conducted the proper inquiry to determine whether the allegation of bias due to juror eye contact with a witness and concomitant taint of the jury had merit, and if so, whether Mr. Richardson suffered actual prejudice. The case before us does not squarely fall within the parameters of our prior contact cases (juror contact with a witness, purported defendant or defendant's relative, and court clerk), either factually or with respect to the extent of the trial court's investigation of the allegation.

While the trial court here spoke to only three of the jurors, as far as we are able to discern, in all of our prior juror contact cases where the appellant's conviction was affirmed, the trial judge's investigation into possible taint of the jury included at least a general question to all the jurors. In *Waller v. United States,* 389 A.2d 801 (D.C.1978), *cert. denied,* 446 U.S. 901, 100 S.Ct. 1824, 64 L.Ed.2d 253 (1980), a man approached a juror as she was leaving the courthouse and told her, "you had better not find him guilty." *Id.* at 804. The juror shared the incident with another juror and then informed the trial court. When the jurors returned to the courthouse to continue hearing the evidence, the trial court questioned the juror who had been told about the incident, and she revealed that she had related the contact to two other jurors, without telling them what the man stated. The trial judge spoke with each juror individually before concluding that each was able to proceed as a fair and impartial juror. *Id.* at 805.

In *Washington, supra,* during a temporary break in a witness' testimony due to a bench conference, two jurors conversed with the witness; one juror carried on the conversation through her sign interpreters. 579 A.2d at 184. The juror who initiated the conversation asked the doctor

what medical school he attended, discussed California weather with him, and learned that the doctor's cases usually settled before trial; the other juror wanted to know what country the doctor was from and inquired about his experiences during World War II. After defense counsel called the matter to the attention of the trial judge, the judge immediately questioned the witness, both jurors, and the sign interpreters. The judge dismissed the juror who initiated the conversation; the hearing-impaired person had not received any communication about cases the doctor had handled. The judge then posed a general question to the remaining jurors before concluding that there had been no juror taint and no mistrial was necessary. *Id.* at 184–85.

While on a lunch break during the course of the trial in *Oliver v. United States,* 711 A.2d 70 (D.C.1998), two alternate jurors heard a government witness call the defendant "a dirty old man." *Id.* at 71 n. 2. When the trial judge received a report of the incident, he questioned the alternate jurors and excused them. The judge also conducted a *voir dire* of the remaining jurors. No other juror was aware of any remarks made to the alternates, and the mistrial motion was denied. *Id.* at 71. In *Parker v. United States,* 757 A.2d 1280 (D.C.2000), a juror heard another juror tell the courtroom clerk that when she served as a juror in a murder trial, "someone connected with the defendant ... showed up at her front door, and she complained to the court about it, and the court, according to her, had not done anything about it." *Id.* at 1285. The juror who overheard the first juror's comments reported them to the trial court, and added that other jurors heard the comments and appeared to be concerned, although she was not. The judge told the remaining jurors "that in all his years on the bench he had never heard of jurors being harassed ...." *Id.* The judge spoke with each juror individually, dismissed one juror who was "anxious," and moved the juror who made the original comments to an alternate slot (the juror was dismissed prior to the commencement of jury deliberations). The following day, another juror reported that she received two collect calls from the D.C. Jail, but upon questioning by the judge, indicated that she could fairly decide the case. Consequently the motion for mistrial was denied. *Id.* at 1286.

*Al–Mahdi, supra,* the case on which Mr. Richardson relied during oral argument, involved a juror who sent the following note to the trial court on day two of jury deliberations: "Judge, I was approached by a cousin of the Defendant and asked if I was going to find her cousin guilty or his mom." 867 A.2d at 1015. Through questioning the judge ascertained that the juror "'felt threatened' and was 'really scared.'" *Id.* at 1016. The juror went to church that evening and requested that the parishioners "pray for her," and she had trouble sleeping. *Id.* Prior to talking to the judge, the juror had related the incident to her fellow jurors, and told them she was fearful. Therefore, the judge conducted a *voir dire* of the other jurors, and then questioned the juror again who had the contact. The judge denied the motion for a mistrial after being satisfied that all of the jurors could render an impartial verdict. *Id.* at 1017. He also instructed the jury about the incident, ordered them to disregard it, and asked anyone who felt he or she could not deliberate fairly to raise his or her hand. No hand was raised, and the trial judge permitted all jurors to resume deliberations. *Id.* at 1018.

In the case where a mistrial was granted, *Carter v. United States,* 497 A.2d 438 (D.C.1985), a juror thought she had been followed by the defendant; however, the person walking behind her was the com-

**598**

plaining witness who claimed he became lost while looking for the U.S. Attorney's office. Two police officers stopped the complaining witness and questioned him, and "about ten police officers escorted the juror and [the complaining witness] back to the hallway outside of the trial courtroom" as other jurors watched. *Id.* at 440. When she returned to the jury deliberation room, the juror spoke about the incident to another juror and other jurors could hear the account. The trial judge questioned the juror involved in the incident and two other jurors, and then granted the motion for a mistrial saying, "[t]here's no way I conclude that the jury is not tainted at this point." *Id.*

■ · As we indicated, the case before us does not fit neatly into any of the cases mentioned above. No words were spoken; and only momentary eye contact occurred, rather than the type of non-verbal contact that happened in *Carter* where a juror thought she was being followed by the defendant. Although the judge originally contemplated the possibility of conducting a *voir dire* of all of the other jurors to determine the impact of the contact on other jurors, he decided to limit his investigation to the two jurors who were involved in the eye contact and the foreperson of the jury. His questioning of these three jurors was careful, methodical and thorough. And he allowed both defense and government counsel to question the jurors. In addition, the judge stopped to look at our case law as a guide to approaching the matter.

Through his investigation, the trial judge learned that the other jurors knew, at most, that one juror (Juror number 4) had had "non-verbal contact like a look" with a witness, Mr. Knight, and that another juror (Juror number 6) "had an issue" or "had something happen." There was no hint of fear on the part of any juror, and both jurors who had the eye

contact stated more than once that they did not feel threatened. Indeed, the reported laughter in the courtroom when the jurors heard that Juror number 4 had been called into the courtroom because of his note belies any notion that the jurors were afraid. Furthermore, we agree with the trial court that whether it was Mr. Knight or someone else with whom Juror number 4 had the momentary eye contact is irrelevant, and that being mistaken is not the equivalent of being a ·liar. The important inquiry, as the trial judge recognized, was whether the jurors remained fair and impartial. Thus, the trial court did not abuse its discretion in rejecting defense counsel's request that he be allowed to question Mr. Knight.

The trial court carefully and appropriately instructed all of the jurors as to their responsibility in order to remove any possible taint before allowing them to continue with their deliberations. He ordered them "not to infer anything from [the] notes [from Jurors number 4 and 6]", and "not to consider them· in [their] deliberations." He further instructed them to base their verdict on the testimony and other evidence introduced at trial, including the exhibits and the stipulations. Mindful that "[t]he extent and type of the trial court's investigation into the [alleged] improper contact are confided to the court's discretion and reviewable only for abuse," *Al–Mahdi, supra,* 867 A.2d at 1019, we conclude that the trial court did not abuse its discretion in conducting a limited investigation under the circumstances of this case, and in denying Mr. Richardson's motions for a mistrial and for a new trial.

Accordingly, for the foregoing reasons, we affirm the judgment of the trial court.

*So ordered.*